UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEVANCE HENRY,

Plaintiff,

v.

Case No. 1:14-CV-1234

HON. ROBERT HOLMES BELL

SHAWNEE SPECIALTIES, INC.,
ELWOOD STAFFING SERVICES, INC.,

Defendants.

_____/

## **O P I N I O N**

Plaintiff LeVance Henry brings this action against Defendants Shawnee Specialties, Inc. ("Shawnee") and Elwood Staffing Services, Inc. ("Elwood"), claiming race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. §§ 2000e et seq., 42 U.S.C. §§ 1981, 1981a, and the Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 et seq. Before the Court is a motion for summary judgment by Defendant Shawnee (ECF No. 60), as well as a motion for summary judgment by Defendant Elwood (ECF No. 61). Plaintiff has filed a response to both motions, and Defendants have filed replies. The Court has determined that oral argument is not necessary. For the reasons that follow, Shawnee's motion will be denied and Elwood's motion will be granted in part and denied in part.

## I.

Rule 56 of the Federal Rules of Civil Procedure requires the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)). When such a motion is filed by the defendant, the "plaintiff must do more than rely merely on the allegations of her pleadings or identify a 'metaphysical doubt' or hypothetical 'plausibility' based on a lack of evidence; [a plaintiff] is obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file, and any affidavits[.]'" *Chappell v. City of Cleveland*, 585 F.3d 901, 912 (6th Cir. 2009) (quoting Fed. R. Civ. P. 56(c); *Matushita*, 475 U.S. at 586-87). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## II.

Plaintiff is an African-American man who resides in Dowagiac, Michigan. He has experience and training for work as a die cast technician. Elwood is a staffing services company that hired Plaintiff in February 2013 and assigned him to work for one of its clients, Shawnee. Plaintiff worked the third shift at Shawnee, when only three people were present, including Plaintiff. The others were his supervisor, Mark Byers, and Bill Lindley, another employee of Shawnee. Both Byers and Lindley are white. Plaintiff contends that, on April 26, 2013, Byers falsely accused Plaintiff of making bad parts, and ordered him to carry hot metal across the floor to another furnace, which was unusual and dangerous. Sometime after that date, Byers approached Plaintiff during the lunch hour, while Plaintiff was reading his Bible. Byers told Plaintiff that he could not read the Bible in the building.

Plaintiff further contends that Byers again falsely accused Plaintiff of making bad parts on May 9, 2013. Byers also told Plaintiff that Byers' father was a racist, and that if Plaintiff had entered Byers' childhood home, Byers' father would have shot Plaintiff. Byers asserted that he was also racist, but that he was trying to overcome it.

According to Plaintiff, on May 17, 2013, Byers cursed and yelled at him. Later that morning, Plaintiff complained to the plant manager, Joe Yacklich, about Byers' statements and actions. Yacklich indicated that he would investigate the matter and consider whether to transfer Plaintiff to a different shift. Yacklich spoke with the President of Shawnee, Mike Huffman. Huffman suggested that they terminate Plaintiff, but Yacklich wanted to see if

3

Plaintiff would improve by working a different shift. Yacklich contacted the supervisor for the second shift, Glenn Smith. Smith told Yacklich that he did not want to work with Plaintiff. Huffman and Yacklich subsequently decided to terminate Plaintiff. That afternoon, Kaci Jones from Elwood called Plaintiff and left a message for him to call her back. When Plaintiff returned her call, she told him that his services were no longer needed at Shawnee, but that he was still on the availability list for work through Elwood. Plaintiff contends that he explained to her what had happened to him, including Byers' comments and actions, and told her that it constituted racial harassment and retaliation. She ended the call. Plaintiff asserts that, after that day, Elwood never contacted him for another job assignment.

### III.

#### A. Count I: Race Discrimination

##### 1. Shawnee

Plaintiff alleges that Defendants took "adverse action" against him "in part" because of his race. (Compl. ¶ 21, ECF No. 1.) As to Shawnee, he contends that the adverse action was his dismissal from his job assignment. Under Title VII, it is unlawful for an employer to discharge an employee because of the employee's race. 42 U.S.C. § 2000e-2(a)(1). The ELCRA prohibits similar conduct. Mich. Comp. Laws § 37.2202(1)(a). Plaintiff may prove discrimination by direct evidence or by indirect evidence under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981). *See Mitchell v.*

*Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (noting that the *McDonnell Douglas/Burdine* framework applies to claims under Title VII and 42 U.S.C. § 1981); *see also Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001) (applying the *McDonnell Douglas/Burdine* framework to a claim under the ELCRA).

To establish a *prima facie* case using indirect evidence, Plaintiff must produce evidence showing that "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008); *see also Lytle v. Malady*, 579 N.W.2d 906, 914 & n.19 (Mich. 1998) (describing the fourth part of the *prima facie* case as requiring the plaintiff to show that he "was discharged under circumstances that give rise to an inference of unlawful discrimination," but explaining that "[t]his four part test is an adaptation of the United States Supreme Court's *McDonnell Douglas* test to prove a prima facie case of discrimination"). "Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant meets this burden, "the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." *White*, 533 F.3d at 391-92. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason

5

for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 393.

### a. Direct Evidence

Shawnee asserts Plaintiff has not offered direct evidence of discrimination. The Court agrees. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

Plaintiff asserts that Byers' remarks, including his statement that he is a racist, constitute direct evidence of discrimination. Plaintiff relies on his deposition testimony and that of Patrice Shelton, who started working for Byers on the third shift shortly before Plaintiff was terminated. Shelton is also African-American. Shelton asserts that Byers referred to her and other African-Americans as "you people." (Shelton Dep. 19, ECF No. 64-17.) Byers also told her that her that his father was racist and that they "did not deal with black people." (*Id.* at 21.) In addition, Byers told her that he was not a Christian. When she confronted him and told him that she was offended by his comments, he told her, "I'm going to the office. You're out of here. I'm fixing to get you out of here." (*Id.* at 22.)[1]

---

[1]Defendant offers testimony of several African-American Shawnee employees (Paul McCoy, Glenn Smith, and Kerby Smith) that they have never heard any racist remarks from Byers or seen him treat others differently on account of race. At this stage of the proceedings, however, the Court must construe all the evidence in Plaintiff's favor. The Court cannot weigh the evidence and decide that Plaintiff's testimony is not credible.

Although Plaintiff's testimony that Byers referred to himself as a racist arguably demonstrates racial animus by Byers, it does not require the conclusion that race was a motivating factor in his actions. A fact-finder must infer that his racial animus motivated his complaints to Yacklich, which then led to Plaintiff's termination. Because of the need for this inference, Byers' remarks do not constitute direct evidence of discrimination. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (holding that an employee's racist statements and beliefs are not direct evidence of discrimination because a fact-finder would have to infer that the employee wanted the plaintiff terminated because of these beliefs). Consequently, Plaintiff must establish a *prima facie* case of discrimination under the *McDonnell Douglas/Burdine* framework.[2] *See Hazle*, 628 N.W.2d at 521 ("Because plaintiff here has offered no direct evidence of race discrimination, she is constrained to rely on the *McDonnell Douglas* framework.").

### b. Similarly Situated

Shawnee argues that Plaintiff cannot satisfy the fourth factor of the *prima facie* case because he cannot show that "he was replaced by a person outside the protected class or

---

[2]The Court recognizes that the *McDonnell Douglas/Burdine* framework does not apply to "mixed motive" discrimination claims under Title VII. *White*, 533 F.3d at 400. In this case, however, Plaintiff does not provide notice of such a claim. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (noting that a plaintiff must provide notice of a mixed-motive claim). Although Plaintiff alleges that Defendants took adverse action against him "in part" due to his race, he does not allege any non-discriminatory reason for his termination or argue a mixed-motivation theory in support of his claim. Instead, he consistently argues that he has offered direct evidence of discrimination or has established a *prima facie* case. Thus, the Court assumes that the *McDonnell Douglas/Burdine* framework applies.

treated differently than similarly situated non-protected employees." *See White*, 533 F.3d at 391. Shawnee notes that Plaintiff was replaced by Paul McCoy, another African-American man. Shawnee asserts that there is no evidence that Plaintiff was treated differently from similarly-situated employees.

Plaintiff responds that Shawnee treated him differently than Byers. Plaintiff presents evidence of the fact that Byers has been reprimanded on a handful of occasions for not following instructions or for making a mistake, yet he was not terminated. For instance, Byers once made the wrong part; he was found smoking in the warehouse; he made unauthorized repairs and/or alterations to a machine; and he forgot to turn off the furnace at the end of his shift. (*See* Exs. 3-8 to Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J., ECF No. 64.)

Byers is not similarly-situated with Plaintiff. As the Sixth Circuit has explained:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated in all respects. *Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir. 1988). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (clarifying that the comparable employee should be similar in "'all of the *relevant* aspects'") (quoting *Pierce v.*

*Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In this case, the differences between Plaintiff and Byers are significant. Byers worked for Shawnee for almost fifteen years; he had been a foreman since 2000. (Byers Dep. 13, ECF No. 64-13.) From 2005 to 2015, he was reprimanded or given a warning five or six times. In contrast, Plaintiff was hired as a temporary employee and had worked at the company for only a few months before he was terminated. During that time, Byers complained to Yacklich on several occasions about Plaintiff failing to clean up his work space, "letting [the] funnel get full, not keeping it cleared, letting the furnace run out of metal . . . , not monitoring his parts for over spray or under spray . . . ." (*Id.* at 23.) Thus, Plaintiff's and Byers' circumstances were readily distinguishable in that Byers' mistakes occurred over the course of several years rather than months, and Byers had far more experience at Shawnee than Plaintiff. Even if some of Byers' mistakes (such as leaving the furnace on after the end of a shift) were relatively serious in terms of the risk of harm, they were mitigated by his long tenure and record of performance at Shawnee. Because Plaintiff had been at Shawnee for such a short period of time, a supervisor could be justifiably concerned that a pattern of even relatively minor mistakes might be indicative of a more serious, long-term problem.

Plaintiff's failure to satisfy the fourth element of a *prima facie* case is not necessarily fatal to his claim, however. "[W]hile a discriminatory inference is *usually*, and perhaps most readily, generated through evidence of unfavorable treatment of the minority plaintiff vis-à-vis similarly-situated individuals, *McDonnell Douglas* and its progeny do not require

this *always* be the case . . . ." *Lindsay v. Yates*, 578 F.3d 407, 417 (6th Cir. 2009). The *prima facie* method "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). "However articulated, the significance of the prima facie case is that it permits an 'inference of discrimination . . . because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987) (quoting *Furnco*, 438 U.S. at 577). Thus, "[t]he central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference [of discrimination]." *Id.* at 269. This initial burden "is not onerous." *Burdine*, 450 U.S. at 253. Construing all the evidence in Plaintiff's favor, the Court concludes that the evidence of racist remarks made by Byers to Plaintiff in the context of criticizing Plaintiff's job performance, as well as Byers' purportedly false accusations of poor performance followed by complaints to managers that led to Plaintiff's termination, and Byers' similarly racist remarks to another African-American employee prior to her termination, constitute sufficient evidence to permit an inference of improper discrimination in Plaintiff's case.

### c. Legitimate Reason / Pretext

Shawnee also contends that Plaintiff's claim cannot succeed through the presentation of indirect evidence because Shawnee has offered a legitimate, non-discriminatory reason

10

for terminating Plaintiff, which is that: (a) Plaintiff repeatedly failed to monitor and operate his machine properly, and (b) he was not wanted by the supervisor of another shift. According to Byers, Plaintiff would allow the funnel in the die cast machine to become clogged, and this was a "regular occurrence." (Byers Dep. 62.) He also allowed the furnace to run low on metal. (*Id.* at 62-63.) In addition, he did not keep table clean, which can result in a bad part, and he failed to monitor his parts for "overspray or underspray." (*Id.* at 23, 64-65.) Byers told Plaintiff that it was important to monitor his machine and keep the table clean where the parts come off the conveyor. (*Id.* at 65.) He had to do this almost every Sunday night. (*Id.* at 23.) Byers complained about all these things to Yacklich. (*Id.*) According to Yacklich, Plaintiff even came to him within a week before he was terminated and stated that "he couldn't seem to do anything right as far as operating the machine" and that "he was continually getting complaints from management as far as . . . his performance." (Yacklich Dep. 26, ECF No. 64-18.)

Contrary to the foregoing, Plaintiff testified that "he always did [his] job well," and that Byers "never had any problem with [his] work product," except when Byers falsely accused him of making bad parts, and when Byers told Plaintiff that he was not spraying the parts correctly while also telling Plaintiff that he was a racist. (Henry Dep. 51, 60.) Although Plaintiff's testimony does not specifically refute each of the deficiencies in his performance noted by Byers, his statement that he performed well in his job arguably creates a factual dispute about the basis for Byers' complaints. In addition, Yacklich's claim that Plaintiff

came to him within a week before Plaintiff was terminated and asserted that he could not do anything right is contradicted by Plaintiff's testimony that he never spoke with Yacklich until the day he was terminated, when he complained about Byers cursing and yelling at him. (*Id.* at 64-65.) These conflicting accounts must be resolved by the trier of fact.

As for the second reason–not being wanted by the supervisor of another shift–Smith indicated that he did not want to work with Plaintiff because "he had heard complaints that [Plaintiff] was not good at taking instruction which led to poor production and quality." (Smith Aff. ¶ 14, ECF No. 60-6.) Smith apparently heard these complaints from Byers. (Yacklich Dep. 32.) Thus, for the same reasons indicated in the previous paragraph, Plaintiff has offered sufficient evidence for a jury to infer that the non-discriminatory reason for his termination (i.e., the failure to perform adequately) was pretext because it was not based in fact.

### d. Honest Belief

Shawnee also asserts an "honest belief" defense, ostensibly arguing that even if its non-discriminatory reason for terminating Plaintiff was not based in fact, it is not liable because it had an honest belief that Plaintiff's performance was not acceptable. "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009). "The key inquiry

12

in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009) (quotation marks omitted). Shawnee does not indicate what evidence would support this defense. As explained below, however, there is very little evidence indicating that Yacklich or Huffman investigated Plaintiff's work performance, let alone that they considered particularized facts. Moreover, as discussed below, Shawnee cannot rely on an honest-belief defense if an improper motivation by Byers' can be imputed to Yacklich and Huffman through a cat's paw theory of liability. *See Pears v. Mobile Cnty.*, 645 F. Supp. 2d 1062, 1093 n.45 (S.D. Ala. 2009).

### e. Same-Actor Inference

Shawnee also asserts that it is entitled to a "strong inference" that the decision to terminate Plaintiff was not racially motivated because the "chief decision makers" with respect to his termination, Huffman and Yacklich, were the same ones who made the decision to hire him. *See Wofford v. Middletown Tube Works, Inc.*, 67 F. App'x 312, 318 (6th Cir. 2003) ("Under the 'same-actor inference' employed in discrimination cases, the fact that the same person or group of people did both the hiring and firing over a short time frame is strong evidence that there was no discrimination involved in the later termination."). This inference is not mandatory, however. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003). Moreover, the inference does not apply if, as indicated in the next

13

section, the decision to terminate Plaintiff was influenced by the racial animus of Byers, who was not involved in the decision to hire Plaintiff.

### f. Cat's-Paw Theory of Liability

Shawnee notes that its President, Mike Huffman, was the final decisionmaker with respect to hiring and firing decisions for Shawnee employees, including temporary employees like Plaintiff. Shawnee contends that, even assuming that Byers made racially insensitive remarks, and was motivated by racial animus, his comments and actions are irrelevant because he was not involved in the decision to terminate Plaintiff. Generally, "[c]omments made by individuals not involved in the decision making process do not constitute direct evidence of discrimination." *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).

However, there is evidence indicating that Byers influenced the decision-making process. According to Huffman, he "was informed that [Plaintiff] was having problems with performing his job and unwilling to follow the direction of his supervisor, Mark Byers." (Huffman Aff. 2, ECF No. 60-11.) Huffman asserts that he attempted to transfer Plaintiff to another shift, but when that attempt "failed," he contacted Elwood and terminated Plaintiff's assignment. (*Id.* at 3.)

Yacklich testified that he was the one who informed Huffman about Plaintiff's performance issues. (Yacklich Dep. 30, ECF No. 64-31.) But Yacklich received his information from Byers. (*Id.* at 31.) Byers told him on several occasions that Plaintiff was having difficulty performing his duties, and was "continually having issues with running bad

parts." (*Id.*; *see also* Byers Dep. 23-24.) At some point, Yacklich also spoke with Plaintiff's co-worker, Bill Lindley, who confirmed that Plaintiff "was not grasping all of the procedures needed to operate the machine" and was "having difficulty paying attention to certain aspects." (*Id.* at 24.) But Byers subsequently reported to Yacklich that he was not seeing any improvement in Plaintiff's performance. (*Id.* at 29-30.) Byers also indicated that something should be done. (Byers Dep. 24.) Yacklich then spoke with Huffman, who suggested that Plaintiff should be dismissed. (Yacklich Dep. 30-31.) Yacklich suggested trying to transfer Plaintiff to the second shift. (*Id.* at 31.) Yacklich contacted Smith, who indicated that he did not want to work with Plaintiff. (*Id.* at 32.)

Smith avers that he refused to work with Plaintiff because "he had heard complaints that [Plaintiff] was not good at taking instruction which led to poor production and quality." (Smith Aff. ¶ 14, ECF No. 60-6.) Apparently, Yacklich knew that Smith had heard these complaints from Byers. (Yacklich Dep. 32.) Huffman and Yacklich subsequently made a joint decision to dismiss Plaintiff. (*Id.* at 35.)

The foregoing evidence indicates that Byers is the source of virtually all the information which led to Plaintiff's dismissal. Byers complained to both Yacklich and Smith that Plaintiff was not performing well, and Yacklich and Smith passed this information along to the ultimate decision maker, Huffman. Byers also instigated the termination process by suggesting to Yacklich that something should be done about Plaintiff. It does not appear that Huffman or Yacklich conducted an independent investigation into the complaints about

15

Plaintiff. Yacklich spoke with Plaintiff's co-worker, Lindley, about Plaintiff's performance at some point, but Yacklich's reason for attempting to transfer or dismiss Plaintiff was based on Byers' complaint that Plaintiff was not improving and Byers' suggestion that something should be done.[3] There is no evidence that Yacklich or Huffman conducted an independent investigation into this issue. Thus, Plaintiff's evidence indicates that Byers intended to influence the decisionmaking process, and that he did so.

Because Byers apparently influenced the decision-making process, Plaintiff asserts that Shawnee can be held liable under a "cat's paw" theory of liability, referring to *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). As the Sixth Circuit has explained:

> The *Staub* Court defined cat's paw liability as follows: "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and that if that act is a proximate cause of the ultimate employment action, then the employer is liable under the [Act]." *Id.* at [422] (emphasis in original). The Court relied on principles of agency and tort law to impute a lower-level supervisor's discriminatory animus to an otherwise unbiased decisionmaker, thereby rendering the employer liable for the non-decisionmaker's discrimination. *Id.* at [418]. If the decisionmaker undertakes an investigation which results in an adverse action for reasons unrelated to the supervisor's original biased action, the employer will not be liable. *Id.* at [421]. However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, *apart from the supervisor's recommendation*, entirely justified." *Id.* (emphasis added). Thus, the Court refused to completely absolve an employer based on its claim to have conducted an independent investigation. *Id.* ("We are aware of no principle in

---

[3]Yacklich also indicated that he heard from "inspection" that Plaintiff had made some bad parts, though it is not clear whether Yacklich was referring to an inspection by Byers or by someone else. (*See* Yacklich Dep. 26.) Yacklich did not inspect the parts himself and did not see any written documentation about Plaintiff's performance issues, from anyone. (*Id.* at 27, 29-30.)

tort or agency law under which an employer's mere conduct of an independent investigation has a claim-preclusive effect.").

*Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012). Under *Staub*, any racial animus by Byers can be "imputed" to Yacklich and Huffman if Plaintiff can show that "(1) [Byers] '*intended* . . . to cause an adverse employment action' and (2) [Byers'] discriminatory action 'is a proximate cause of the ultimate employment action.'" *Id.* (citing *Staub*, 562 U.S. at 422).

There is sufficient evidence to satisfy the elements of a "cat's paw" theory in this case. As discussed, there is evidence indicating that Byers intended to cause an adverse employment action because he recommended that something should be done about Plaintiff. In addition, because Huffman and Yacklich relied upon Byers' complaints, there is evidence that Byers' actions were a proximate cause of Plaintiff's termination. Consequently, a jury could find Shawnee liable for discriminatory conduct by Byers, even though Huffman was the ultimate decisionmaker with respect to Plaintiff's employment at Shawnee.

In short, Shawnee is not entitled to summary judgment with regard to Count I because a genuine factual dispute remains as to whether: (1) Byers exhibited racial animus toward Plaintiff, (2) Byers' racial animus, if any, motivated his complaints about Plaintiff, and (3) Byers' complaints were a proximate cause of Plaintiff's termination.

### 2. Elwood

Elwood asserts that Plaintiff has not proffered evidence to create a genuine issue of fact as to his claim of race discrimination. In response, Plaintiff asserts that he will not pursue

17

a race-discrimination claim against Elwood. Consequently, the Court will grant judgment in Elwood's favor as to Count I of the complaint.

**B. Count II: Retaliation**

In Count II of the complaint, Plaintiff claims that Defendants retaliated against him in violation of Title VII and the ELCRA. Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Similarly, the ELCRA prohibits retaliation or discrimination against a person "because the person has opposed a violation of this act . . . ." Mich. Comp. Laws § 37.2701.

A plaintiff may prove unlawful retaliation under Title VII or the ELCRA by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (Title VII); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311 (6th Cir. 1989) (ELCRA). Here, Plaintiff does not present direct evidence of retaliation. Consequently, Plaintiff must establish a *prima facie* case. To do so, Plaintiff must demonstrate by a preponderance of the evidence that:

> 1) he engaged in activity that Title VII [or the ELCRA] protects; 2) defendant knew that he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists.

*Abbott*, 348 F.3d at 542. "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). "After proving the existence of a *prima facie* case, the burden [of production] shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action." *Id.* at 562. "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action." *Abbott*, 348 F.3d at 542.

In order to establish a causal connection, a plaintiff "'must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects.'" *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (quoting *Abbott*, 348 F.3d at 543). "[A]t the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Nguyen*, 229 F.3d at 566. "One way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor*, 703 F.3d at 339.

### 1. Shawnee

Plaintiff alleges that Shawnee retaliated against him for complaining about racial harassment and discrimination by ending his work assignment. According to Plaintiff, he told Yacklich on May 17, 2013, about "racial statements" that Byers had made towards him on May 9, about Byers telling him not to read his Bible during the lunch break, and about Byers pointing his finger in Plaintiff's face. (Henry Aff. 2, ECF No. 64-1.) The same day, Yacklich and Huffman decided that he should be terminated.

Although Shawnee has filed a motion for summary judgment on all of Plaintiff's claims, it does not discuss the retaliation claim in its brief. Consequently, the Court cannot discern a basis for granting summary judgment in Shawnee's favor as to Count II.

### 2. Elwood

Plaintiff also alleges that Elwood retaliated against him for complaining about racial harassment and discrimination occurring at Shawnee by not referring him to any new jobs after he was removed from the Shawnee job assignment. (Compl. ¶ 26.)

#### a. Awareness of Protected Activity

Elwood asserts that Plaintiff cannot establish a *prima facie* case of retaliation because he has not shown that he engaged in protected activity, and that Elwood was aware of this activity. Elwood notes that, in order to engage in a protected opposition activity under Title VII or the ELCRA, Plaintiff must prove that he took an "overt stand against suspected illegal discriminatory action." *Comiskey v. Auto. Indus. Action Group*, 40 F. Supp. 2d 877, 898 (E.D. Mich. 1999); *accord Blizzard v. Marion Tech. College,* 698 F.3d 275, 288 (6th Cir.

2012) (applying the ADEA). "In other words, an employee 'may not invoke the protections of the Act by making a vague charge of discrimination.'" *Id.* (quoting *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)).

Construing the evidence in the light most favorable to Plaintiff, he did not merely make a vague charge of discrimination. Plaintiff explained to Ms. Jones what happened to him, telling her "the whole situation," and that he "didn't understand why [he was] being terminated." (Henry Dep. 77, ECF No. 61-12.) At his deposition, Plaintiff was asked whether he told Ms. Jones about the "discrimination that had taken place," and he responded, "Totally everything, discrimination, harassment." (*Id.*) Based on this testimony, a jury could find that Plaintiff provided sufficient details to Elwood to make clear that he was taking an "overt stand against suspected illegal discriminatory action." *See Comiskey*, 40 F. Supp. 2d at 898; *see also Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity.") (internal quotation marks omitted).

Elwood asserts that Plaintiff could not have provided sufficient details to Jones because he admitted that his phone call was cut short before he discussed the alleged discrimination. Elwood mischaracterizes Plaintiff's testimony. Although Plaintiff acknowledged that his call with Jones was only about "a minute and a half," and that she interrupted him and ended the call before he finished what he was "trying" to tell her, he

made clear that he explained "everything" to her, including the discrimination. (*See* Henry Dep. 77, 117-18.)

Elwood points to deposition testimony from Jones and from one of its managers, Lorrie Kish, that Plaintiff did not complain about discrimination or harassment to anyone at Elwood and, thus, they were not aware of any protected activity. (Jones Dep. 23-24, ECF No. 61-12; Kish Dep. 37, ECF No. 61-12.) However, a jury is not required to accept the testimony of Elwood's employees, and at this stage of the proceedings, the Court is not permitted to determine whether Plaintiff's testimony is more or less credible than the testimony of Jones and Kish.

Elwood also points to the report by an EEOC investigator, which states that Plaintiff "confirmed that he did not report any harassment from [Shawnee] to [Elwood]." (EEOC Investigative Report 4, ECF No. 61-8.) According to that same report, however, Plaintiff stated that he "reported racial discrimination to [Elwood's] employee when they notified him that his assignment ended with Shawnee[]." (*Id.*) In other words, Plaintiff did not report the discrimination to Elwood before his assignment with Shawnee ended, but he claims that he did report it when he spoke with Jones on May 17, 2013. Thus, the report is consistent with Plaintiff's deposition testimony, which is sufficient to create a factual dispute regarding Elwood's awareness of Plaintiff's protected activity. In short, Plaintiff has offered sufficient evidence to establish a *prima facie* case of retaliation.

### b. Legitimate Reason

Elwood contends that, even if Plaintiff has established a *prima facie* case, there is no dispute that it had a valid reason not to give Plaintiff another work assignment: he did not tell

Elwood that he was available as required by its policy. According to Elwood's employee handbook, which Plaintiff acknowledged when he was hired, he was required to notify Elwood of his availability within 48 hours after the end of any assignment, and every thirty days thereafter. (Associate Handbook 3, ECF No. 61-2.) Failure to do so is deemed "an abandonment of interest in assignment consideration." (*Id.*)

Plaintiff cannot recall whether he told Elwood that he was available for another work assignment, but he asserts that Jones was aware of his availability because she told him during the May 17, 2013, call that he was "on the availability list." (Henry Dep. 119, 121.) Based on Plaintiff's testimony, a jury could reasonably infer that Elwood understood that Plaintiff was available for another work assignment, and/or that Plaintiff's phone call on May 17, 2013, sufficiently communicated his availability for, and interest in, another work assignment within 48 hours after the end of his assignment with Shawnee.

Furthermore, even though the policy requires notice of availability within 48 hours, there is no evidence that Elwood enforced this requirement. Indeed, Jones testified that, as a matter of practice, when an individual does not call to inform Elwood of their availability, it marks them as unavailable after 45 days have passed. (Jones Dep. 37.) Similarly, Kish testified that an individual must check in once every 30 days, and they are marked as unavailable after 45 days if there is no contact. (Kish Dep. 36.) Thus, Plaintiff has offered sufficient evidence to refute Elwood's assertion that it did not offer him another position because it considered him to be unavailable. Construing the evidence in Plaintiff's favor, at least for the first 30 days after Plaintiff's assignment ended, Elwood considered him to be available for another assignment.

Elwood also claims that it could not have retaliated against Plaintiff because Jones called Plaintiff to offer him another position, but he did not return her call. (*Id.* at 36.) However, Plaintiff adamantly asserts that he never received any calls from Elwood. (Henry Dep. 123.) He also notes that there is no record of any call from Jones to Plaintiff to offer him another position in Elwood's activity log. (*See* Activities and Forms for Levance D. Henry, ECF No. 61-6.) Plaintiff's evidence is sufficient to create a factual dispute about whether Elwood contacted him to offer him another position, and whether any failure to do so was the result of inaction on his part.

Elwood also claims that Plaintiff cannot demonstrate retaliation because it attempted to help him find another position. When Jones spoke with Plaintiff, she encouraged him to contact Elwood on a weekly basis regarding his availability, in order to be given a higher priority for placement. (Jones Dep. 18-19.) According to Plaintiff, however, Jones simply told Plaintiff that he was on an availability list. (Henry Dep. 119.) The parties' differing accounts give rise to a factual dispute that cannot be resolved at summary judgment. Moreover, even if Jones encouraged Plaintiff to call, it does not necessarily undermine Plaintiff's claim. Elwood could have encouraged Plaintiff to call regarding his availability *and* refused to give him another work assignment.

Finally, Elwood asserts that Plaintiff has not offered evidence of another position that was available and that Elwood failed to offer him. This argument was not raised in Elwood's initial brief; thus, it is not properly before the Court. *See Int'l-Matex Tank Terminals-Illinois v. Chem. Bank*, No. 1:08-cv-1200, 2009 WL 1651291 at *2 (W.D. Mich. June 11, 2009)

("noting the well-settled rule that 'this court will not consider arguments that are raised for the first time in a reply brief.'") (citing *Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, 602 F. Supp. 2d 829, 872 n.24 (W.D. Mich. 2008)). Moreover, Elwood's assertion is factually incorrect. There is evidence that another work assignment was available. Plaintiff testified in his deposition that Chassix was hiring a number of die cast technicians through Elwood around the time that Plaintiff lost his assignment at Shawnee; Plaintiff's uncle obtained such a position. (Henry Dep. 124-25.) In addition, Jones acknowledged that Elwood generally has "a lot of die cast positions . . . available," and that this sort of position was probably what she had in mind when she called Plaintiff after May 17, 2013. (Jones Dep. 40.) Consequently, Plaintiff has satisfied his burden to come forward with evidence to refute Elwood's asserted reason for not offering Plaintiff another position. Thus, Elwood is not entitled to summary judgment as to Count II.

## IV.

For the reasons stated, the Court will deny Defendant Shawnee's motion for summary judgment. The Court will grant Defendant Elwood's motion for summary judgment, solely as to Count I of the complaint. Elwood's motion will be denied as to Count II of the complaint.

An order consistent with this opinion will be entered.

Dated: <u>March 31, 2016</u>                    /s/ Robert Holmes Bell
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE